# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **JOHN D. FOSBINDER,** )<br> )<br> **Plaintiff,** )<br> )<br>vs. )<br> )<br>**COVENTRY HEALTH CARE OF** )<br>**NEBRASKA, INC.,** )<br> )<br> **Defendant.** ) | 8:06CV522<br><br>**ORDER** |

Now pending before the court is the defendant's MOTION FOR PROTECTIVE ORDER AND TO SET BRIEFING SCHEDULE FOR JUDICIAL REVIEW OF ADMINISTRATIVE RECORD [27]. The motion has been fully briefed. For the reasons discussed below, I find that the motion should be denied.

## I. BACKGROUND

This action arises under the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq*. ("ERISA"). The Amended Complaint [14] alleges that plaintiff's employer, Omaha Bedding Company, was a Health Plan Member in a group health plan (the "Plan") administered by the defendant ("Coventry"). Plaintiff was covered under the high deductible plan issued by Coventry.

Plaintiff alleges that he was diagnosed with, and suffered from, severe osteoarthrosis involving the right ankle. On November 29, 2005, plaintiff's medical providers recommended that he undergo a surgical procedure involving the insertion of an Agility ankle prosthesis with fusion of the tibia-fibula syndesmosis. On December 7, 2005, plaintiff's medical provider, Alvine Foot & Ankle Center ("Alvine"), contacted Coventry's customer service division to obtain information about benefits, limitations, and exclusions under the Plan. Alvine provided Coventry a CPT code and an

ICD-9 code for the procedure and was given benefit information for a total ankle arthroplasty to be performed as an outpatient procedure.

On December 13, 2005, plaintiff received a total ankle replacement, i.e., a total ankle arthroplasty ("TAA"). Two days later, Coventry sent plaintiff a letter stating that it would not approve the procedure for reimbursement. Coventry also refused coverage for outpatient antibiotic infusion therapy which plaintiff received to remedy a condition resulting from the TAA. Plaintiff has exhausted his administrative remedies under the Plan. Coventry continues to refuse to pay benefits on grounds that the TAA was "experimental or investigational."

Coventry denies liability. It affirmatively alleges that the Plan affords it "sole and absolute discretion" to determine whether a procedure or treatment is experimental or investigational and that it properly exercised its sole and absolute discretion in denying coverage in this instance.

The parties conferred pursuant to Fed. R. Civ. P. 26(f) and exchanged initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1). Plaintiff then served additional discovery requests on Coventry, and Coventry filed the motion now under consideration.

## II. LEGAL ANALYSIS

In its Motion for Protective Order [27], Coventry asks that the court limit the scope of discovery to its production of the administrative record[1] and prohibiting plaintiff from conducting discovery beyond the administrative record. Plaintiff contends that discovery is needed in order to determine whether Coventry's determination that the procedure in question was "experimental or investigational" and its decision to deny benefits was the result of procedural irregularities or

---

[1] Coventry advises that its "administrative record" is attached as Exhibit A to its Reply Brief [32].

financial conflicts of interest, which are the factors which govern the standard of review in ERISA proceedings.

### A.     Standard of Review

"[A] denial of benefits challenged under [29 U.S.C. § 1132(a)(1)(B)] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where a plan gives its administrator or trustees discretionary authority to determine eligibility for benefits, the court reviews such a decision for an abuse of discretion. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. at 115; *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998).

The deferential "abuse of discretion" standard of review applies unless the beneficiary comes forward with evidence establishing that the administrator acted under a conflict of interest, dishonestly, with an improper motive, or without using judgment.[2] *Sehulka v. Lucent Tech., Inc.*, 206 F.3d 763, 768 (8th Cir. 2000). Thus, to obtain a less deferential review of the defendants' decision to deny benefits, plaintiff "must present material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to [plaintiff]." *Woo*, 144 F.3d at 1160. To satisfy the second part of this requirement, the plaintiff must only show that the conflict or procedural irregularity has 'some connection to the substantive decision reached.'" *Woo*, 144 F.3d at 1160-61.

---

[2] In this regard, the court must determine whether the administrator in fact exercised its plan-authorized discretion in the course of denying the benefits. If the administrator did not, the denial of benefits may be reviewed *de novo*. *See Boldon v. Humana Ins. Co.*, Case No. CV06-02818, — F. Supp. 2d — , 2006 WL 3759459 at *7 (D. Ariz., Dec. 13, 2006).

*Accord Schatz v. Mutual of Omaha Ins. Co.*, 220 F.3d 944, 946-47 (8th Cir. 2000); *Sehulka*, 206 F.3d at 768;

If the record reveals evidence of "a palpable conflict of interest or a serious procedural irregularity," courts within the Eighth Circuit must review the plan administrator's discretionary decisions with less deference. *See Woo*, 144 F.3d at 1161. In this respect, the Eighth Circuit has recognized that not every conflict of interest warrants *de novo* review; rather, the Eighth Circuit has adopted a "sliding scale" approach, reducing the degree of deference accorded to a plan administrator's discretionary decisions in proportion to the extent of the conflict of interest and its effect upon the administrator's benefits determination. *Woo*, 144 F.3d at 1161.[3]

---

[3]The Eighth Circuit's analysis in *Woo* is not unlike that recently employed by the district court in *Boldon v. Humana Ins. Co.*, 2006 WL 3759459 at *7-8:

[I]f the administrator both possessed and actually exercised discretion in denying benefits, the precise level of scrutiny with which to review the denial must then be determined. A denial of benefits should be reviewed with greater scrutiny if a plan gives discretion to an administrator that has a structural conflict of interest due to its status as both administrator and funding source.... Other factors to consider in determining the appropriate level of scrutiny include evidence of malice, self-dealing, "a parsimonious claims-granting history," inconsistent reasons for denial, inadequate investigation into a claim, failure to credit a claimant's reliable evidence, a history of denying "benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record," and procedural irregularities.... Unlike *de novo* review, review for an abuse of discretion is generally limited to the administrative record before the plan administrator at the time of its decision. *Id.* at 970.

Finally, after determining the appropriate level of scrutiny, that scrutiny must be utilized in deciding whether the administrator actually abused its discretion in denying coverage. "ERISA places the burden of proving an exclusion from coverage in an ERISA-regulated welfare plan on the plan administrator." *Caffey v. Unum Life Ins. Co.,* 302 F.3d 576, 580 (6th Cir. 2002); *see also Fought v. Unum Life Ins. Co. of Am.,* 379 F.3d 997, 1007 n.4 (10th Cir. 2004). The administrator will have failed to satisfy this burden and accordingly abused its discretion if it construed a coverage exclusion in a fashion that "conflicts with the plain language of the plan." *Wallace v. Intel Corp.,* 2006 WL 2709839, at *9, 2006 U.S. Dist. LEXIS 67693, at *26 (D. Ariz. Sept. 20, 2006).

(Citations omitted).

**B.     Summary of the Record**

Turning to the Plan itself, section 5.1 of the Plan[4] indicates that "surgical services" and "prosthetic devices" are generally covered[5], but prior authorization[6] is required. Pursuant to section 6.1.3, generally excluded services or items include "any service, supply, equipment, drug, or procedure that is not a Covered Service." Specifically excluded under section 6.2.59 are "[p]rocedures and treatments that We [Coventry] determine, in our sole and absolute discretion, to be Experimental or Investigational, and treatment of complications resulting from such procedures and treatments." The Plan, at section 13.17, provides the following definition of "Experimental or Investigational":

> A service, supply, equipment, drug or procedure is deemed experimental or investigational if one or more of the following conditions are met:
> 1. Any drug not approved for use by the FDA; any drug that is classified as IND (investigational new drug) by the FDA; any drug for which Prior Authorization is requested that is proposed for off-label use;

---

[4] All citations to the Plan are taken from the copy found at Exhibit D of Filing 29.

[5] Section 5 of the Plan advises that the Plan covers
only those health services, supplies, drugs, and equipment that are (1) listed in section 5 ... (2) deemed Medically Necessary, (3) provided by a Participating Provider (under the Health Maintenance Network Coverage Option) or a Non-Participating Provider (under the Out-of-Network Coverage Option), and (4) not excluded under the Exclusions and Limitations set forth in Section 6 or elsewhere in this Evidence of Coverage.
   Plan participants are also forewarned that "All Prior Authorizations and determinations referenced in Covered Services are made by Us. If a service is Medically Necessary but not specifically listed and not otherwise excluded, please contact Us to confirm whether the service, supply, drug, or equipment is a Covered Service."

[6] The terms "Authorization/Prior Authorization/Authorized" are defined in section 13.2 as follows: The Health Plan has given approval for payment for certain services to be performed. Upon Authorization, all inpatient Hospital stays are then subject to concurrent review criteria established by the Health Plan. If You need speciality services from a Non-Participating Provider, an Authorization means the Member's Participating Provider has recommended a Non-Participating Provider for treatment of a specific condition, and the Health Plan has assigned an Authorization for a certain number of visits or days. Authorization does not guarantee payment if You are not eligible for Covered Services at the time the service is provided.

2. Any service, supply, equipment, drug or procedure that is subject to the Medical Review Department review and/or approval;
3. Any service, supply, equipment, drug or procedure that is the subject of a clinical trial that meets criteria for Phase I, II or III as set forth by FDA regulations;
4. Any service, supply, equipment, drug or procedure that is considered not to have demonstrated value based on clinical evidence reported by Peer-Review Medical Literature and by generally recognized academic experts.

Section 16 of the Plan instructs the insured "to contact Customer Service to verify eligibility and/or benefits" by sending written inquires to an address in London, Kentucky or by calling a certain 800-telephone number. A different toll-free telephone number is designated to contact Coventry "for pre-certification."

Coventry's December 15, 2006 letter denying coverage explains that, "based on the medical information supplied," it deemed the procedure to be "experimental or investigational." The letter, signed by one Robert E. Masterson, DO, MBA, states that the total ankle arthroplasty "is a specific benefit exclusion," then quotes policy sections 6.1.5, 6.2.69 and 13.17 (which contain no specific references to total ankle arthroplasty). The letter does not explain the rationale for this decision, but offers, "Criteria available free of charge upon request." The letter also advises,

> The fact that a Coventry Health Care physician or provider may prescribe, recommend, order, or approve a service or supply does not itself determine medical necessity or make such a service or supply a covered benefit. If there is additional information available which was not previously submitted, please have the requesting provider submit this information to our Health Services Department at the below listed address or fax number. The following information is necessary for the Plan Medical Director to perform further review:
> • N/A – Excluded benefit

On January 5, 2006, plaintiff's medical providers (whom he designated to act on his behalf) wrote to Coventry, submitting a first-level appeal. The author of the letter, who initially spoke to Coventry's customer service representative to verify plaintiff's benefits, limitations, and exclusions

under the Plan, commented that at no time during that discussion was she told that Coventry considered the procedure to be experimental or investigational.

Plaintiff's first-level appeal was denied on January 19, 2006 after review by James Murray, DO. Dr. Murray's notes (marked COVFO 000201) reveal the following analysis: "DENY TOTAL ANKLE ARTHROPLASTY AS PER TECH ASSESSMENT ANKL-1 THE PROCEDURE IS CONSIDERED INVESTIGATIONAL/EXPERIMENTAL[.]" The January 19 letter advised the plaintiff that coverage was denied specifically because "Efficacy has not been established for ankle replacement in the treatment of osteoarthritis. Therefore, is considered investigational/experimental and not covered under member's Evidence of Coverage." The letter goes on to quote the policy provisions quoted in the December 15, 2005 letter, and further reveals:

> **Internal Rule, Protocol, or Guideline Used:** Coventry Health Care Technology Assessment for Ankle Replacement in the Treatment of Osteoarthritis.[7]

In response, by letter dated February 9, 2006, plaintiff's medical providers forwarded to Coventry a copy of their pre-certification form and the operative notes. The letter advises that the doctor's office called Coventry for pre-certification on December 7, 2005 and spoke with "Barb," who was asked if there were any exclusions or policy limitations on the procedure code 27702. Barb did not inform them that this surgery was not a covered benefit.

On February 13, 2006, a representative of Dr. Alvine's billing office wrote to Coventry, taking issue with Coventry's position that the procedure performed on the plaintiff was "experimental." "As you can see by the information that I am attaching for your review, this

---

[7] A partially-legible version of this document is included in Coventry's Filing 32-4 (page 29 of 43). The pages are marked COVFO 000230 through COVFO 000234.

procedure has been performed for over 20 years. It is FDA approved and has been deemed payable by Medicare Standards for years."

Plaintiff's second-level appeal was held on February 27, 2006 at 2:30 p.m. by telephone before a three-member panel. By affidavit, plaintiff has testified that he telephoned Coventry's Appeal Coordinator and, among other things, asked whether he needed to be represented by an attorney at the February 27 meeting. She advised him that he did not need to be represented by an attorney at the second-level hearing, but would probably want to hire an attorney if the case proceeded to a court appeal. Coventry's "administrative record" indicates that the session was moderated and recorded by Coventry's Appeal Coordinator. Found in proximity to the denial letter dated February 27, 2006 and signed by Medical Director Ross Halliday, MD, are what appear to be the notes of the three voting members of the appeals panel, i.e., Dr. Halliday, Rod McKinney, DO, and Dahlia G. Saldana, MD. All three doctors are employed by divisions of Coventry.

Dr. Halliday's notations, which are not easy to read, appear to reflect his analysis that "[t]he pre-op authorization was explained to my satisfaction. The procedure is rarely done in most foot/ankle circles. The published results are [word illegible]. Uphold non auth[.]" Notations signed by Dr. Saldana state:

> 2/27/06       UPHOLD DENIAL
> 2 35 pm.  –   Reason: CHC Tech Assessment – ankle replacement for the treatment
> of osteoarthritis is considered G/I
>     Criteria used:  Tech Paper

An unsigned page, presumably completed by Dr. McKinney, states: "0 clinical information to support override of Coventry Tech assessment."

Dr. Halliday's February 27, 2006 letter advised plaintiff that his second-level appeal was denied for this specific reason: "Efficacy has not been established for ankle replacement in the

-8-

treatment of osteoarthritis. Therefore, is considered investigational/experimental and not covered under member's Evidence of Coverage." The determinative "Internal Rule, Protocol, or Guideline Used" was once again identified as "Coventry Health Care Technology Assessment for Ankle Replacement in the Treatment of Osteoarthritis." The letter finally advises that this was Coventry's final level of appeal and plaintiff had the right to "bring a civil action under ERISA section 502(a)."

Apparently, the doctors who reviewed plaintiff's appeals relied heavily, if not entirely, on the "Coventry Health Care Technology Assessment for Ankle Replacement in the Treatment of Osteoarthritis," which indicates that it was last reviewed in November 2005. There is no information as to who prepared the document or reviewed it, or their qualifications for doing so. The document acknowledges that the Agility Ankle Revision Prosthesis, the device received by the plaintiff, was approved by the FDA on May 20, 2002 and is intended to give the patient limited mobility by reducing pain, restoring alignment and replacing the flexion and extension movement in the ankle joint. The document notes that several other prosthetic devices are not FDA approved. The scientific literature summarized in this document, contains summaries of the following reports and articles published between 1992 and 2004, most of which do not concern the device in question:

- 1992 long-term follow-up report regarding the Conaxial (Beck Steffee) total ankle replacements made between 1975-1977, concluding that the device should no longer be implanted because of a 90% loosening rate at 10 years and an overall complication rate of 60%

- 1996 report regarding the Mayo total ankle arthroplasty in procedures performed at the Mayo Clinic from 1974 through 1988. The authors did not recommend ankle arthroplasty with a constrained Mayo implant for rheumatoid arthritis.

- 1998 article reporting that ankle arthroplasty had the advantage of restoring ankle motion and relieving pain, the initial results were "plagued" with a high complication rate, namely, early loosening of the prosthesis.

- 1999 textbook, Principles of Surgery (7th ed.) states that immobilization of the joint with an ankle brace and use of a rocker-bottom shoe sole is helpful in controlling pain. In severe cases, arthrodesis [joint fusion] of the ankle may be successful.

- In 1999 an article was published regarding a study of 100 cases treated with ankle arthroplasty, who were followed prospectively and annually for up to 15 years.

- 2001 report concluding that "until there is a total ankle implant developed that stands the cost of time, ankle arthrodesis [joint fusion] would continue to be the gold standard in the operative treatment of the arthritic ankle joint.

- 2002 report concluding that "total ankle arthroplasty continued to evolve as a viable treatment option" for end-stage ankle arthritis, especially in older, low-demand, nonobese patients who had osteoarthritis or rheumatoid arthritis. There was considerable controversy about whether the procedure should be performed on younger, more physically active patients.

- 2003 report that further laboratory investigation and clinical trials were needed to improve ankle replacement as position as a major alternative to ankle arthrodesis.

- 2003 report on the Buechel-Pappas prosthesis used clinically over a 2- to 10-year period in 49 patients ranging in age from 26 to 71.

- 2003 review of the intermediate-term results of 51 consecutive Scandinavian Total Ankle Replacements (STAR).

- "According to the 2003 Canale: Campbell's Operative Orthopedics, 10th edition textbook, the published short term results of total ankle arthroplasty do not justify its widespread application for ankle arthritis outside of investigational centers."

- 2004 intermediate-term results of the early version of the Agility total ankle replacement in procedures performed by a single surgeon between 1984 and 1994. The authors concluded that "arthrodesis of the tibiofibular syndesmosis impacts the radiographic and clinical outcomes with the Agility total ankle replacement. The relatively low rates of radiographic hindfoot arthritis and revision procedures at an average of nine years after the arthroplasty are encouraging. Agility total ankle replacement is a viable and durable option for the treatment of ankle arthritis in selected patients."

- 2004 results of a study done to determine the demographic and clinical predictors of reoperation and failure as to total ankle arthroplasties performed using the DePuy Agility Total Ankle System between 1995 and 2001. Age was found to be the only significant predictor of reoperation and failure after total ankle arthroplasty; the functional outcome of this procedure was uncertain.

- 2004 study reporting the short-term results in a consecutive series of 116 patients/122 ankles.

- 2004 article on the midterm results of 68 total ankle replacements with the Scandinavian Total Ankle Replacement (STAR ) prosthesis.  "According to the authors, the early experience with the STAR ankle implant was encouraging; however, they have encountered more complications and potential problems than previously reported.

The "administrative record" does not indicate that any other clinical evidence was reviewed or considered by Coventry.

Having reviewed the administrative record produced by Coventry, it appears that the only research it reviewed that is specifically relevant to the plaintiff's actual treatment indicated that the "Agility total ankle replacement is a viable and durable option for the treatment of ankle arthritis in selected patients" and that age was "the only significant predictor of reoperation and failure after total ankle arthroplasty" using the Agility device.  It appears from the record that the plaintiff was in the appropriate age group and physical condition to obtain substantial medical benefit from this particular procedure.  Significantly, Coventry has never taken the position that treatment for plaintiff's condition was not medically necessary.

### C.     Matters Outside the Administrative Record

On February 21, 2007, the Eighth Circuit, in *Rittenhouse v. UnitedHealth Group Long Term Disability Ins. Plan*, Case No. 06-1905, — F.3d —, 2007 WL 517739, observed that "[i]n an ERISA benefits-denial case, a district court may consider evidence not in the administrative record 'if the plaintiff shows good cause' for its omission."  Slip op. at p.7, 2007 WL 517739 at *4.  After filing this lawsuit, the plaintiff procured a copy of a letter dated June 18, 2004 addressed to a Coventry insured and approving the payment of benefits for a Left Ankle Joint Replacement:

> Coventry Health Care of Nebraska, Inc. has completed your First Level Appeal regarding the above request. This review was sent out to an External Review Organization (ERO) to be reviewed by a licensed Orthopaedic Surgeon.

> According to your appeal, you are requesting that we reconsider allowing benefits for you to undergo left ankle joint replacement. Based on the ERO's examination of the Plan provisions and the medical information given to us, including letter and records from Franklin Alvine, MD, the left ankle joint replacement is certified under the terms of the benefit plan.

The letter goes on to explain that payment for this procedure, if performed by an out-of-network physician, would be made at a lower reimbursement rate than if the procedure was performed by a physician within Coventry's provider network.

I find that the plaintiff has shown good cause for failing to introduce this information at the administrative level, as the document was not then in the plaintiff's possession.

### D.     Plaintiff is Allowed to Conduct Discovery

I am persuaded that the plaintiff should be allowed to conduct discovery in this case for two reasons: (1) the information (or lack thereof) found in the "administrative record" suggests that Coventry's representatives did not in fact exercise plan-authorized discretion in denying benefits, and (2) the materials submitted by the parties suggest to me that there were "procedural irregularities" involved in Coventry's denial of benefits in this instance.

In *Larson v. Minnesota Chamber Bus. Serv., Inc. Employee Welfare Plan*, 114 F. Supp. 2d 867, 869 (D. Minn. 2000), the district court acknowledged that, as a general rule, courts do not allow the parties in ERISA cases to take additional discovery. The judge concluded, however, that as in an appeal regarding Social Security disability benefits "a party may obtain discovery to substantiate its claim that the finder of fact failed to fully develop the record" in an ERISA case. *Id.*    In this case, it was Coventry's obligation to preserve an appellate record.

Coventry's initial denial of benefits dated December 15, 2006, stated bluntly that ankle arthroplasty was not covered because Coventry deemed the procedure to be "Experimental or

Investigational." The letter advised the plaintiff that the procedure was specifically excluded under the Plan[8] and that no further information was necessary for the Plan Medical Director to perform further review because "N/A – Excluded Benefit," but that plaintiff could appeal the decision.

Plaintiff's doctors provided additional information about the Agility Total Ankle System for consideration on the first-level appeal, and also pointed out that Coventry's customer service representative was given a complete and accurate description of the proposed surgery and verified that plaintiff had insurance coverage for the procedure. I also note that Coventry was aware of the proposed date of the surgery, but did not decide to deny benefits until after the surgery was performed. The court can find no unambiguous language in the Plan that would require the plaintiff to wait for a written verification of coverage before undergoing a surgical procedure. Indeed, the Plan gives numerous toll-free telephone numbers, and appears to strongly encourage participants and health care providers to contact Coventry by telephone to verify the existence of coverage.

There is no indication that Coventry's Medical Director considered any of the information submitted by the plaintiff in denying plaintiff's first-level appeal. His decision, dated January 19, 2006, merely quotes the "recommendation" found in the "Coventry Health Care Technology Assessment for Ankle Replacement in the Treatment of Osteoarthritis," a document that cited no clinical information published later than 2004.

Coventry's "administrative record" indicates that a telephonic hearing was held on February 27, 2006 before a three-member panel of doctors employed by Coventry and that the proceeding was

---

[8]The Plan contains no specific exclusion for this procedure; it is not specifically listed and not otherwise excluded under the Plan. By reading the Plan, an insured could not know of Coventry's position that the procedure would not be covered. When plaintiff followed Coventry's directive to "contact Us to confirm whether the service, supply, drug, or equipment is a Covered Service," he was advised by Coventry that he had coverage for this procedure.

"recorded" by its Appeal Coordinator. There is no clear record of who participated in the hearing, and the substance of any comments or information given by the plaintiff or his representatives cannot be found in Coventry's record. The reviewing doctors' written notes of the telephonic hearing, and Coventry's letters denying coverage, express no consideration whatsoever of the merits of the Agility ankle prosthetic device in conjunction with the plaintiff's medical condition, although Coventry's own literature indicates that this particular device had been used successfully in patients of the plaintiff's age and general physical condition. The record does not demonstrate that the doctors employed by Coventry to review this matter exercised any meaningful, professional discretion in reaching their conclusion that total ankle replacement is always "experimental or investigational."

Considering the state of the "administrative record," together with evidence that in 2004 Coventry provided coverage to another insured for ankle joint replacement surgery, I find that the plaintiff has offered evidence that "gives rise to serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim." *See Tillery v. Hoffman Enclosures, Inc.*, 280 F.3d 1192, 1197 (8th Cir. 2002). "[W]hen the plan administrator fails to give an adequate explanation of how it has construed the plan and applied it to the facts of a particular claim, the reviewing court must seek a fuller explanation from the administrator and then apply the deferential standard of review on an adequate record to determine whether the decision 'is extraordinarily imprudent or extremely unreasonable.'" *Bernards v. United of Omaha Life Ins. Co.*, 987 F.2d 486, 488 (8th Cir. 1993) (quoting *Cox v. Mid-America Dairymen, Inc.,* 965 F.2d 569, 572 (8th Cir. 1992)); *see also Leonhardt v. Holden Bus. Forms Co.*, 828 F. Supp. 657, 666 (D. Minn. 1993).

Here, the Plan administrator's records do not give an adequate explanation of how Coventry construed the Plan and applied it to the facts of the plaintiff's claim. Accordingly, I find that the plaintiff should be allowed to conduct discovery to that effect.

### E.   Scope of Discovery

Pursuant to paragraph 6 the Initial Progression Order [21] entered on November 6, 2006, "[e]ach party is limited to serving fifty (50) interrogatories on any other party." Although the plaintiff's outstanding discovery requests appear to be relevant to the issues discussed herein, there is some question as to whether the plaintiff has exceeded the 50-interrogatory limit under NECivR 33.1(c), which provides:

> **(c)   Number of Interrogatories.** For purposes of determining the number of interrogatories, including sub-questions, each inquiry that endeavors to discover a discrete item of information shall be counted as a separate interrogatory. For example, a question which states: "Please state the name, address, and telephone number of any witness to the accident set forth in the complaint" shall be counted as three interrogatories.

If necessary, and if plaintiff wishes to do so, he may withdraw certain interrogatories or serve an amended set of interrogatories complying with the 50-interrogatory limit.

### ORDER

The court finds that the plaintiff should be allowed to conduct discovery in this matter, as discussed above. Accordingly,

**IT IS ORDERED:**

1.   Defendant's MOTION FOR PROTECTIVE ORDER AND TO SET BRIEFING SCHEDULE FOR JUDICIAL REVIEW OF ADMINISTRATIVE RECORD [27] is denied.

2.   If necessary, and if plaintiff wishes to do so, he may withdraw certain interrogatories or serve an amended set of interrogatories complying with the 50-interrogatory limit set in the Initial Progression Order.

**DATED February 22, 2007.**

                                        **BY THE COURT:**

                                        **s/ F.A. Gossett**
                                        **United States Magistrate Judge**